We are now going to move to the second case of the morning. This is Appeal 22-1013, Timothy Kingman v. William Retko. We will begin with argument from counsel for the appellant, Mr. Retko. William Retko Good morning, Your Honors. This is Attorney William Retko, and I'm here this morning on behalf of the plaintiff, Timothy Kingman. At this time, before I get started, I'd like to reserve three minutes for rebuttal. Timothy Kingman I'll be granted. William Retko Thank you. This case involves a public employee, Timothy Kingman, going to a public forum and speaking as a citizen to expose issues involving – Judge Cardone Mr. Retko, before you get too far down the First Amendment road, I just want to confirm that you are not appealing the district court's ruling on your ADEA claim? William Retko That's correct. Judge Cardone All right. Thank you. William Retko This is just on the First Amendment. Judge Cardone Thank you. I just want to clarify that. William Retko Thank you. It's a misuse – he was trying to expose a misuse of the office the city administrator was conducting and how he was interacting with certain persons that are the head of the city. In doing so, he first approached the city administrator and the mayor separately and identified to them issues that he saw with city government that needed to be corrected. They told him basically, we don't care and we disagree. Do whatever you need to do. So it was at that point he went to a city council meeting, and there's an open forum before the city council meeting starts. That open forum is for citizens of the community to get up and express their concerns. In order to do that, he had to sign into a sheet and have his name called, and at that time – Judge Cardone You weren't disputing that he also had to attend those meetings as part of his job, correct? William Retko He did. He was at those meetings as part of his job as a director of public works, but his job required that when he's at those meetings that he only participate on the agenda items after the meeting starts and only on those items that dealt with the Department of Public Works. In this particular case, he attended the meeting, signed up, spoke as a citizen in the open forum, and presented items regarding issues involving the city administrator and what he perceived to be misuse of the office by the city administrator together with – Judge Cardone So he gave them – what's at issue is his declaration of no confidence. William Retko Yes, that's correct. Judge Cardone And throughout this declaration, he refers to himself as an employee. He and the others sign it as employees. What impact should that have on the citizen versus employee aspect of Garcieta? William Retko It should have no effect at all because the Supreme Court in this court has specifically found that oftentimes it's employees of government that are able to expose the misconduct of government. Judge Cardone It might be accurate, but my question is a little bit different. Not just the fact that he is an employee, but that throughout this declaration, he is making these representations and he is signing it as an employee. William Retko He did so because he wanted to explain how he had personal knowledge of these things, and he gained the personal knowledge through his employment, and that's why he did that. But he wasn't expressing himself as an employee. That's why he spoke in the public forum as a citizen. How about his comment that he felt he had a duty to make these statements? William Retko Well, he felt like he had a duty to the citizens of the community to protect the community from these wrongs and the misuse of government that was going on. He felt like he had a duty to speak out for the citizens of this community, and it wasn't a part of his job duty because his job duty had nothing to do with evaluating the city administrator or anything else, and a part of his job duty had nothing to do with reporting misconduct in office. He did that as a citizen, and he did that so that the community would be protected and understand what was happening at City Hall. Much like somebody who sleeps on the job or who doesn't show up to work but still gets paid, that's what was going on here a lot of times. He was indicating that the city administrator was never meeting with people. He was missing meetings. He wasn't at work, never emailed. He only texted or made press releases, and if you ever objected to anything that was going on in city government, you were told, you're an at-will employee. We're not a group of I's. We're a group of we. In other words, he was silencing communication from city employees to the community, and that's not something that can be allowed in our system of government. Our system of government is a free and open system of government that allows for communication from employees of the government to get to the community so the community knows what's happening and can make proper decisions about what's going on in city government, and that's exactly what the city administrator and those persons, the other defendants involved in this case, were trying to prevent was the free flow of information to the community. They wanted to make sure only the information they wanted to get to the community got to the community. Examples of that were that they changed the community or the form of government from that of being a committee to that of being a committee of the whole, meaning that person, when government acted in committees, it allowed for department heads and for citizens to show up at committee meetings and make ideas and hear what was happening and what was going on in certain parts of city government, but when they went to a committee of the whole, there was no discussion anymore. It was killed. It all went to where the city council at a two-hour meeting every two weeks would vote on things and do things without any discussion or involvement with the community or department heads. So what was happening was my client was exposing the fact that the free flow of information was killed. It was over with, and if you tried to communicate or do anything to communicate to the community what was happening, you were told you were at will and you were going to be terminated. Mr. Retko, would you mind if I ask you a different line of questions? Yes. Okay. So let's just suppose you're right about all that. Why is the district court's, let's just call it a causation analysis, why is the district court's causation analysis wrong, even if everything you just said is right? Well, the causation analysis that the court undertook was they assumed that Mr. Kingman somehow had all these complaints made against him and that could lead to termination. The all transpired well in advance of way back in 2018, 2016, 2017, before all this. It had all been worked out and they found it to have no merit. No, no, no. No, no, no. I'm not sure about that. Okay. I read the record a little bit differently. Maybe I'm wrong and you can tell me. I thought that the Department of Public Affairs, I thought that he attended a June 24th, 2019 city council meeting. He did. Okay. And I thought that at that meeting, he presented various complaints about, go ahead. You can interrupt me. Go ahead. Yeah. The only thing he presented from what I understand and from what the defendants acknowledge in their depositions is that he said that my client had told him to terminate employees of the DPW who had gone through the city council and made complaints at an April 22nd common council meeting. And that was contrary to what my client had indicated. And it was also contrary to documentation that was withheld from investigators and from the city council on April 25th requesting from the mayor and Mr. Guild whether or not discipline should be issued to these employees. And what he meant by discipline was verbal warnings to follow the procedure and filing complaints with an internal government system. That's all he meant. Okay. And that was never responded to, and nor was that email ever provided to investigators or to the city council. It was withheld. I think the record shows that Mr. Heckerdell went to that meeting and conveyed complaints. And the complaints were all vague and they were all templates based on what Mr. Guild had drafted for these employees to file. And none of them were on specific complaints. Rather than try the complaint here, let me just put forth what I think is in the record, and then you can answer. I got a legal question. Yes. Not trying to figure out who's right or wrong on the facts. Okay. Okay. The record also shows that there is a May 2019 report from the lawyer, Macy, and this other gentleman, Hermas, that also conveys these concerns about the way your client was managing his particular group, the public works group. And that complaint investigation report is not flattering to your client. So my question is, I read the district court opinion to basically say there's a major causation problem here. There's an intervening set of events. And those intervening set of events are these issues regarding Mr. Kamen's management of his own group that led to the termination. Okay. Why? I think that's an accurate recitation of what the district court did. Okay. Now your part. Why does that reflect legal error? The problem was that the legal error was that there's issues of fact regarding what happened here. What happened here were the complaints that were made by these individuals were all vague complaints, not specifically setting forth any complaint. Okay. Can you get specific? What's that? Can you get specific? Who complained? What did they say? And why was it vague? Okay. Every person that filed a complaint filed a template that Mr. Guild drafted for them. Well, that doesn't make their complaint vague. Well, in the depositions, they didn't set forth any example of anything other than the hostile work environment or harassing work environment, but they never say anything specific. And their written complaints are part of the record. What about the finding that after I think there were eight separate complaints made that your client sought to have those employees disciplined or fired for complaining about him? Because that was part of the district court's motivation or causation reasoning. And that's exactly the point. The point is that my client never did that. He denied that. And moreover, there was an email in place at the time that was relevant. That was at the time the alleged allegations were occurring, which my client asked Mr. Guild and the mayor, Mr. Frederickson, whether or not discipline should be issued. He said, after speaking with my supervisors, I'm wondering, should we even issue discipline? Please advise. No discipline was ever issued. None. There's no evidence any discipline was ever issued. Okay, how about that document that's called the, whatever it's called, complaint investigation. Here's what it says. For over a three-day period, this is referring to April of 2019, April 22nd and April 23rd, I believe. Mr. Kingman demanded that his supervisory staff discipline slash terminate those employees that made statements at the council meeting. What's vague about that? The issue is Mr. Kingman denied that. And there is no documentation to show it. The only documentation shows that he didn't issue discipline after talking to the supervisor. Okay, so is it your point? Let me just, so your point that rule, an application of federal rule 56 in the face of your client saying it did not happen compels trial. Yeah, it's an issue of fact. Who's telling the truth here? Because I've got a bunch of defendants in this case who are claiming things that didn't occur and things that had, and when you depose them and ask them, what are you complaining about? And they all say, well, for instance, Mr. Froehlich, he testified, the complaint I was bringing up, or what I was upset about, took place in April of 2018. That had already been investigated by the interim city administrator at that time, the one that preceded Guild, and he found there was no merit to the complaint. How do you get around the email from April 23rd, 2019, from your client, where he's instructing the foreman Hertel to discipline, quote, all employees who have voiced their concerns without use of required employment process? Because two days later, he sends another email to the mayor and to Mr. Guild. After speaking with the supervisors, I am now wondering, should we even issue discipline? Please advise. And that never was responded to, nor was it ever shown to the investigators, nor was it ever presented to the council. So that was hidden, just as Mr. Kingman's personnel file was hidden, and never shown to the investigators, apparently, and never shown to the council before he was terminated. In fact, it was later discovered that Mr. Guild had taken that personnel file and taken critical issues from it regarding prior investigations, and they were scattered around his office, around the mayor's office, and in a cupboard in the basement, for which Mr. Guild was criminally charged for misconduct in office and entered into a plea agreement, which he complied with, and the case was ultimately dismissed based on his resolution of the plea agreement. Your time has expired. We'll give you a couple minutes of rebuttal on the other side. I appreciate that. Thank you. Thank you. We'll now hear from the appellee, Mr. Kingman. Good morning, your honors, and may it please the court. The city of Rhinelander discharged plaintiff appellant Timothy Kingman, city's former director of the Department of Public Works, or DPW, following a thorough outside investigation that revealed Kingman's years-long tyranny as a bully in the DPW. Kingman constantly belittled and intimidated his subordinates. From 2015 to 2019, no fewer than a dozen DPW employees lodged complaints against Kingman, who frantically sought to contain these complaints to his own oversight. Finally, in April 2019, a group of eight DPW employees mustered the courage to speak before the city council, imploring the council to take action on what they called a long-standing hostile work environment. The record in this case details the history and gravity of Kingman's toxic presence in the DPW. The great irony of this case, in which Kingman alleges he was discharged for speaking out against his supervisor, Guild, is that Kingman's final act of misconduct was a desperate, prolonged attempt to get one of his foremen, Heckerdl, to discipline the eight DPW employees for speaking out against their supervisor. Mr. Kingman, what's your response to Mr. Retko's argument that the evidence from this time period is vague, that he was trying to have the folks that spoke out disciplined? That's what his position is. It's vague, it's disputed, there's a flip side of the coin, you know, et cetera, et cetera. Your Honor, initially, the eight complaints did not refer to Kingman directly. And the record demonstrates that this was because these employees feared retaliation from Mr. Kingman. He had a history of retaliating against employees who complained about him. But then came a thorough investigation by outside investigators. And it was in through that investigation that it became readily apparent that all of these employees were referring to Kingman himself. What's your recollection of what the record shows Mr. Heckerdl reported at the June 24th, 2019 City Council meeting? Your Honor, Mr. Heckerdl appeared before the Council and informed the Council that over a period of three days, from April 23rd to April 26th, 2019, following the night of April 22nd, eight DPW employee complaints, Mr. Kingman privately implored Mr. Heckerdl to discipline or terminate these employees. He sought to have Mr. Heckerdl do his bidding. And as the court has pointed out, Mr. Kingman put in writing, he put in an April 23rd email that he sought to have these employees disciplined. And where in the record can we find what you just said about the June 24th meeting? Is that in Heckerdl's deposition? Your Honor, it is. Where's it at? That is Mr. Heckerdl's affidavit. And attached to it are his contemporaneous notes, very detailed notes, documenting these exchanges with Mr. Kingman over a period of three days. Okay. And is there anything in the record of City Council members at that meeting saying, what are you talking about? It's too vague. It's ambiguous. We don't understand what you mean. Not to my knowledge, Your Honor. Did Kingman deny that at the hearing? He had the opportunity to speak as well at the meeting. That is correct, Your Honor. Mr. Kingman did have, he was interviewed subsequent to these complaints and then did appear at the final discharge meeting, the second of two meetings at which the council considered the investigation report. I'm talking about the June 24th meeting that you and Judge Scudder were just discussing, where Mr. Heckerdl explained that Mr. Kingman had condemned him to have these eight, I guess seven, because one was a former employee, fired in light of their complaints against him. What was Mr. Kingman's response at that June 24th meeting? My understanding, Your Honor, is that Mr. Kingman denied that allegation despite the fact that he had put in an email, put in writing that he intended for these employees to be disciplined. Mr. Kingman, he appeared at this meeting with his council. He had every opportunity to explain to the council how his email was somehow inconsistent with his intent to discipline these employees. Mr. Kingman was an at-will employee. He was a department head. He had no due process right, and yet the council allowed him to appear. Before it, alongside Mr. Heckerdl and the council heard both individuals' statements, and this court has stated countless times that this court is not to sit as a super personnel department. The council handled this as well as I think any employer could. Mr. Kingman, this question of public concern, are you aware of any precedent from our court or other circuit courts that matters of public concern cease to be a matter of public concern once they're part of a public record? Your Honor, as I understand, you're referring to the district court's citation to its own decision. As I stand here, I cannot direct the court to a Seventh Circuit opinion. However, I think the logic is sound. If the rationale for the matters of public concern requirement is that a public employee may be in a position to bring to public light potential wrongdoing, then it makes sense that if it's already been brought to light, then the employee is not the first to do so. He's not the one to alert the public to any potential wrongdoing. He could, in theory, use that as, use his knowledge of what has been presented in the news as a means of insulating himself from discipline. And I think that is what was going on in this case is that Mr. Kingman had this years-long history of complaints against him, pre-dating and post-dating his declaration against Guild and the new administration. And he thought that he would double down on things that had already been reported in the news and seek to insulate himself from any discipline so that he could claim First Amendment retaliation should he incur any further discipline. Mr. Kingman, let me run a question by you and you can help me out in thinking about it. You agree or disagree that matters of fiscal management concerns with local government are much more likely to be a public concern in a smaller community rather than a larger community? I do agree, Your Honor. Okay. And it's not hard for me at all to envision in a small town, it seems like this is fair to, this is a small town, right? Correct, Your Honor. That it would be of some public concern how much money was being spent on furniture or anything else and whether people were losing their jobs because of political witch hunts or things along those lines, right? Yes, Your Honor. You could write stories in the paper, they could talk about it at the local diner, it could be a matter of public concern. Or it may not be if you're thinking of the public writ large in a city like Chicago. In that way. Okay. Doesn't that raise a difficult measurement question in this area of First Amendment law? It does, Your Honor. I think it's... And so if you, I think you are right, that you can set aside 8, 9 out of 10 of the things that Mr. Retko is focused on. But Mr. Retko makes a fair point, does he not? When he's talking about expenditures of public funds on here, it happens to be on office furniture. And I don't remember that there's some kind of political hit jobs or political witch hunts. There's some kind of buzz phrase that's thrown around here that way. If we're measuring this in the fishbowl that the speech is occurring, why is Mr. Retko not right? But it's a matter of public concern. At least on those aspects of the case. You're totally right. It's not a matter of public concern that they're using different stationery. Of course not. Your Honor, I think there are two problems with Mr. Kingman's reference to the expenditure on furniture and this idea of expenditure of public funds. I agree with Your Honor that such an issue may be of greater concern in a smaller community. I think that on a micro level, the issue is that Mr. Kingman's big misstep with his declaration was that he spoke in vague innuendo. And I think that demonstrates that his was an internal audience. He made a specific request that his declaration be considered for Mr. Gild's performance. Why is it that vague on the office furniture and the political firings or whatever he was complaining about? In jobs or something. In my view, Your Honor, the exact language from the declaration is a deviation from longstanding financial practices. There is actually no reference to furniture or office supplies. But the people in the local community could say, look, they've lost their minds. They're spending like crazy over there. And in our view, Your Honor, that was, I don't think the community could reasonably infer from that single phrase that Mr. Kingman was referring to this issue that had already been raised in the news of an expenditure of some $13,000 on office furniture. And I think intuitively, Your Honor, the second problem is the classic slippery slope argument. If everything that entails expenditure of public funds is a matter of public concern, then everything is a matter of public concern. And then the question just becomes whether the employee is speaking as a private citizen or pursuant to his or her official job duties. And on that note, Your Honor, as to the capacity in which Mr. Kingman spoke, as the court has acknowledged, the declaration does state at beginning and end that Mr. Kingman and the four others who signed the declaration were speaking as employees. Mr. Kingman acknowledged at his deposition, quote, as an assigned public official, I have the duty to report problems. He even concedes that he proceeded through the chain of command in raising his concerns about Mr. Gill. And that takes his concerns outside of First Amendment protection. That would be true whether Mr. Kingman went to his immediate supervisor, Gill, and or to his supervisor's supervisors, Mayor Fredrickson or the council. Garcetti says the court must make a practical inquiry into whether the employee was speaking pursuant to his or her official duties. Mr. Kingman admits he spoke as an employee. He signed the declaration as an employee. He spoke at the outset of a council meeting. He was required to attend as an employee for the express purpose that his declaration be considered for Mr. Gill's performance review. It cannot reasonably be said in our view that he spoke as a private citizen, that he donned the hat of private citizen. And with respect to the matters of public concern, as the district court correctly noted, any attempt to construe Mr. Kingman's declaration or remarks so broadly as to find that it even touched on matters of public concern would be wholly unwarranted in light of its content and context. Finally, your honors, as to the Pickering balancing test, in our view, it's clear on this record that the city's interest in maintaining harmony in the workplace outweighed Mr. Kingman's interest in his speech, rendering his speech unprotected for First Amendment purposes. I think the two greatest factual points here are that in response to Mr. Kingman and his colleagues signing a declaration of no confidence, 15 employees signed a declaration of full confidence in Mr. Gild, and a majority of these employees were Mr. Kingman's subordinates while Mr. Kingman was still in power, so to speak. And almost needless to say, Mr. Gild was Mr. Kingman's direct supervisor, and clearly this would put a strain on their working relationship, both in the short and long term. Considering Mr. Kingman's complaint against Mr. Gild and the DPW employee's complaint against Kingman, the common denominator was Kingman. Had the declaration caused his discharge, his discharge would have been permissible to prevent continued disruption of the workplace. Thank you, Mr. Kingman. Your time has expired. Thank you. Thank you. Mr. Retko, we'll give you two minutes in rebuttal. Your Honors, I'd like to first address the fact about the Pickering balancing test. There's no evidence of disruption at the DPW in regard to its operations. There's no evidence Kingman was not performing his job. And even before the speech that Mr. Kingman gave to city government, Mr. Gild was not meeting with Mr. Kingman. So there was no breach in their relationship because he wasn't meeting with Kingman or any other department head to begin with. In regard to the email, one thing I do want to note is that everyone's correct. There was an April 23rd email in which Kingman instructed, said he was instructing his foreman to issue complaint forms to the DPW employees so they could file complaints for the investigation and to give verbal warnings, verbal warnings to those employees for following the required employment process. Nowhere did he say discipline beyond a verbal warning. Nowhere did he say he was going to terminate these employees. Moreover, there's a follow-up email on April 25th. That Kingman sent to the mayor and Mr. Gild, which indicated that based on the discussions we've had with three foreman regarding the issuance of verbal warnings, he had several questions before further action would be taken and asked, should verbal written warnings be issued due to these specific instances? That was never responded to, nor was that email ever shown to the investigators or to the council. And that email specifically indicates that after speaking with the foreman, he determined, should we even issue written warnings? Let me know. Did Mr. Kingman raise that with the council? When he went in front of the council, the council merely asked him, did you tell your foreman to terminate these employees for filing the complaints? And he said, no, I did not. He didn't raise this April 26th email though? No, he was never asked. And he was never brought into a situation where he thought he would have to raise it. What about in the interview with the investigators? He interviewed with those two folks, didn't he? The investigators were investigating his allegations into the no confidence of Mr. Gild. Yeah, what about the second, the other report I was talking about earlier? They issued a report on your client. They issued a report on my client, yes. Right, and didn't he interview with them? But the investigation where they were interviewing him, it's my understanding, they were covering his allegations of no confidence into Mr. Gild. That's what they were interviewing him about. Oh, they never interviewed him in connection with that other report? Not that I'm aware of. I thought they said they did. Is that when he refused to participate with them? He refused to participate with them quite often until Mr. Gild told him, hey, I'd like for you to come to my office and meet with me. And he showed up in Mr. Gild's office and Mr. Gild left and the investigators came in. So they say here, maybe they're wrong. It's an odd thing to write. Also among the person's interview, the investigators interviewed Mr. Tim Kingman, Director of Public Works. They did interview him. Right, in connection with the report I was reading about the next page says he was threatening or telling people they should be disciplined. Yeah, he would have never admitted to them because he didn't ever do that, that he was telling the- But if you go back to what Judge St. Eve is talking about, if he's interviewed in connection with an inquiry into that, why doesn't he just take a copy of the April 26th email with him and give it to him? Because it was part of the record and it was something that should have been presented to these investigators. Part of the record before the investigators? The investigators were presented information by Mr. Gild and Mr. Gild also set up all the interviews for them. Yeah, but if Mr. Kingman thinks, hey, the email exonerates me, you'd say I brought 25 copies of it for you all. That I can't answer because I wasn't there. I don't know that. Thank you, Mr. Retko. Okay, thank you. Your time has expired. I appreciate that. This case will be taken to advisement. Thanks to both counsel.